Case No. 15-1297, United States Postal Service Petitioner v. Postal Regulatory Commission. Mr. Bell for the petitioner, Mr. Tenning for the respondent. Was it this your case, Tim? The Postal Service case? I have. There's been one in between that Patty got. Oh, I know. I mean, this is like Groundhog Day. Always interesting. That he never died. Never died. Let's wait till the courtroom is clear. Just wait till the courtroom is clear. Okay. They didn't stick around? All right. Mr. Bell, good morning. This is our morning for repeat litigation. Good morning, Your Honors. May it please the Court. There's one overriding issue before the Court. And it's whether the commission on remand changed the test that this Court upheld for determining when the Great Recession ceased being an extraordinary event, for purposes under the statute. And I think they clearly did, and I think if the Court agrees, I think the case has to be remanded. And I want to explain the context in which this issue arises. When the case was last before the Court, the Court did three things pertinent to the incident case. First, it upheld the commission's four-part so-called new normal test. And that was the test that determined when the Postal Service gained the ability to adjust to the volume losses that the Great Recession caused. It also vacated a separate rule, the count-once rule, as being inconsistent with the ability to adjust prong of the test. And the final thing it did, as to the factual question of when the Postal Service gained the ability to adjust to the volume losses, the Court did not disturb the commission's finding. But it said the commission was free to consider whether that finding was inconsistent with other aspects of its analysis. And it's the commission's resolution of that last question that's before the Court now. When the case went back on remand, we pointed to essentially three sets of findings that we felt were inconsistent. Let me just stop you a second. I think it's possible to over-read footnote three. And what I'm asking you is, are you over-reading it? Are you reading it to say that that panel said to the commission, you need to revisit this or you need to reconsider this? If you are, I think you're over-reading it. I think it's simply saying, this wasn't brief, this isn't before us. And almost as a throwaway line, if the commission wants to deal with it, it's free to. I mean, that could have been left out. And the point of the footnote is, we're not going to consider it. Your Honor, I don't think that I don't interpret what the Court said is that they must consider it. The commission was free to say we're not considering it. But what the commission did instead was change the test. And that, to me, shows that, A, they did consider it. You can't change a test without reconsidering your prior analysis. And that question is, I think, properly before the Court. So had the commission merely said, for example, look, we're not addressing this at all, period, I can't say that I can't promise we wouldn't be here. It's a very important case to the Postal Service, but I think we'd be in a very different posture. Okay, so first of all, what test are you talking about and how did the commission change it? I think they changed it in two pertinent ways. Which is? I'm sorry, Your Honor. The test is the four-part test, what they call the new normal test. It had four prongs to it. And I think it boils down to essentially two questions, that test. First was when did the Great Recession stop forcing mail volume further down? Essentially, when did mail volume plateau at a new and lower level than it was before? And the second part of that embodied, I think, in the fourth prong of the test is when did the Postal Service gain the ability to adjust to that new and lower level? And what, all right, so that's the test. Now, what the commission, how the commission changed it, it changed it in two ways. First, it changed what ability to adjust means. The ability to adjust, now the claim is that ability to adjust just means to take steps to adjust. Just as long as the Postal Service That's not entirely true. I mean, there are data suggesting that in fiscal year 2010, the Postal Service was able to enormously improve total factor productivity. I myself have some problems on how you deal with an entire year, which, after all, is broken into days and months. But putting that aside, isn't that, that's what number four calls for. That was in respect to that finding, and that was a finding that it made. We went back on remand, as we were allowed to do, and said that the reliance on total factor productivity, which is essentially a finding that we became more efficient, does not actually answer Well, more efficient in light of the decline in volume. Well, more It's a critical thing, right? Well, more efficient, I mean I mean, there are doubtless ways you could have become more efficient. Apart from the decline in volume, but the point was that this was an increase in efficiency, which tended to offset the effects of the decline in volume and the change in unit cost. And the point we were making is, there are a couple of points on this. As to the increased efficiency, I mean, total factor productivity is just a question of how effectively are you using the resources you have. And we agree that we were being efficient Well, it also involves unloading some resources, such as the, I think, 200,000 decline in employment. Right. And again, a couple of points about that. First of all, I mean, in terms of unloading employment and things like that, we were doing that from day one. And so, if that were alone enough, I don't think that was the court's understanding of what ability to adjust means, or else the count once test itself would have been fine. I mean, we were taking steps immediately. But to specifically address the question about total factor productivity, we challenged that finding below as saying, as being not a good measure of our ability to adjust. I think remarkably Is that in your brief in alliance? Is it our brief in alliance? We, I don't know that that specific finding, well, no, it was actually. It wasn't there. Because what we were saying was that that, I don't know that we use the term total factor productivity, but we said that the finding that we could have adjusted in 2010 was in tension with other findings the commission made. The question, or the finding that we could have adjusted in 2010 was based on total factor productivity. We did make that challenge. I think it's pages 32 to 34 of the alliance brief. Again, I don't remember that we specifically said total factor productivity. But basically what we had was a finding that you could have adjusted in 2010, and then several findings that suggested we couldn't have adjusted in 2010. And that was the conflict that we pointed out in the alliance briefs. If I can turn to the total factor productivity point, we said that that's, look, that's just not a good measure of our ability to adjust. All that shows is we were being more efficient. We agree we were being efficient. But the problem is we didn't have the revenue that we needed to offset the harm that the Great Recession had done. And I think in response, and I think this is remarkable. The absence of revenue comes in on the necessary part because of the risk of the Postal Service being quite broke, right? It comes in partly there, but it also comes to the point that the revenue disappeared too quickly for us to catch up to it. We had been chasing that volume down, the lack of revenue down, for several years. And the Commission determined in their fiscal analysis report that they issued, or the financial analysis report that they issued three months after the order 1926, that it wasn't until 2013 that we brought our, or we started to really, I think the phrase they used was, begin to have appreciable savings from our efforts that we had been engaging in all the way from 2008. But back to the total factor productivity point, I think it's remarkable that in response to our argument that, look, total factor productivity isn't a good measure of adjustment, the Commission never said, yes, it is. It never tried. It never even relied on that finding. It ignored it completely. And I think it's also remarkable that the term productivity appears nowhere in the Commission's refund appeal. I think what the Commission ultimately did was determine that ability to adjust really just meant taking steps. And I think the problem with that is that that effectively reads the exigency provision out of the statute. To put a finer point on the productivity, productivity is a measure of efficiency, right? In order to even qualify for an exigent rate increase, we have to show we were efficient. It's right in the statute that we were engaged in honest, efficient, and economical management. But now the Commission is saying that if you were being efficient, you can't get a rate increase because it's no longer an extraordinary circumstance. And that puts the Postal Service in a catch-22. We have to show we were efficient. We have to show we were taking steps in order to qualify for an increase. But if we make that showing, we can't get one. And that, to us, is a fundamental misreading of the statute. And it's also not consistent with what the Commission told this court, that the new normal test, or, sorry, the ability to adjust pronged that. The counsel said that that was the point, and this is an oral argument transcript on page 53, that that was the point where we expected you to entirely adapt going forward. Now, counsel said that was a stray comment that was made during oral argument, but it wasn't. It was a direct response to this court's questioning, a long series of questioning that began at page 46 of the transcript about how is the count-once, the ability to adjust under the count-once rule different from the ability to adjust under the new normal test. And counsel's response was basically, look, the count-once rule embodied the idea that you have to do something, that you have to take steps, you have to try to cut your costs. And that new normal reflected something more robust than that. It referred to actual, as they said, the ability to entirely adapt going forward. This court vacated the count-once rule. And now, I think, by saying that ability to adjust just means take steps, but the commission is trying to take a concept they said was part of count-once and put it back into the new normal test. And I see my time's up already, and I just, if I may, I'd like to make one final point as to the ability to adjust. Just a story, taking a step back. The ability to adjust is important because it's a limitation on the exigency provision, that you have an extraordinary event. Everybody agrees the Great Recession was an extraordinary event. And the ability to adjust is a limitation. When you can adjust to the event, it stops being extraordinary. That's, I think, at bottom what this court, the principle this court upheld in the last decision. But I would argue the inverse is equally true, that if you can't adjust to a situation, then it doesn't stop being an extraordinary event. And in that respect, the ability to adjust is there to protect the Postal Service from events that are beyond its control, events that it can't mitigate effectively. And maybe given the procedural posture of this case, the Commission wasn't required to answer the question of what could we have done that we didn't do in 2010. I mean, their argument, their position is we could have adjusted in 2010, even though we clearly didn't adjust until later. At no point has the Commission ever said anything we should have done that we didn't do. And perhaps they didn't have to answer that question. I don't think the conclusion was that you had done or at least started to do and thereby showed your capacity to do what was necessary. And again, I think that's consistent with sort of a take steps approach to what ability to adjust means. And again, I think that would all but read the exigency provision out of the statute. If taking steps were enough to cut off the recovery, and we have to prove that we were taking steps in order to even qualify for the recovery, then when does the exigency provision ever apply? But my final point is just that maybe the Commission didn't have to resolve the factual question, but it couldn't get around of resolving the question by pretending the question itself doesn't really matter. And I think fundamentally that's what happened under EMAB. The Commission basically said whether you can adjust at all, if maybe it's a factor, we just mean taking steps. But I think that they have read out, I think, what the core protection of the exigency provision was, which is that when we can't adjust to an extraordinary event, then it doesn't stop being extraordinary. I'd like to, if I could get some time for rebundal, I would appreciate it. If the Court doesn't have any further questions, we ask the Court remand these. Thank you. All right. Mr. Tenney? Thank you, Your Honor. May it please the Court. Counsel now concedes that the footnote in this Court's opinion didn't require the Commission to reopen this issue on remand. I think I heard him say that, and that would certainly be correct. And so this case can begin and end with what the Commission actually did. And if you look at 579 of the Joint Appendix, that's page 23 of the new order, the order on review. First sentence, in this section, the Commission declines to revisit the new normal analysis in order number 1926 that was affirmed by the ANN, that's Alliance Court. And then if you just read, it's about five pages of the Commission's decision. It says over and over again, if you look at the next page, page 580, the Commission declines to revisit an issue that has already been resolved. And if you flip to the end, and there may be other times in the middle, but 583 at the bottom, for the foregoing reason, the Commission declines to revisit the new normal analysis in order 1926. Now, counsel's argument is that the Commission changed the standard, applied a new standard. What the Commission did was said, we're not changing anything about this. We're fixing the count once thing that the problem that this court identified, and then we're done. That's what the Commission did. Now, if you look. That's a change. What? That's a change. I'm sorry. They're not changing anything with respect to the new normal. They did change. This court ordered the Commission to change, and the Commission did change the count once. And just make one more point, Your Honor. If you look at page 21 of plaintiff's, I'm sorry, petitioner's brief, there's a table there, and it sort of illustrates the difference between these two things. There's a bunch of numbers on the table, and what the numbers reflect are, at the end of its entire analysis, how much mail volume the Commission was counting as due to the Great Recession. And you'll see that there are numbers in parentheses. Where is this? On 21 of petitioner's brief. It reflects a chart that's in the joint appendix, but it's easily laid out in their brief. You'll see that there are numbers, and some of the numbers changed. The negative numbers, there are bolded negative numbers which reflect the changes. They've gotten bigger because the Commission corrected the count once mistake that this court identified last time. But then toward the right of the table, there's a bunch of zeros, and the zeros are where the new normal kicks in. So the Commission was counting mail volume. This court said it was counting it wrong, and the Commission fixed that. There's no dispute about that. But then to the right of the table, there are zeros, and those zeros are the times when the new normal kicked in. So for first-class mail, it kicked in in 2011. For standard mail, it kicked in in 2010. That's when the zeros start. And periodicals, it kicked in in 2012. That's when the zeros start. Package services, 2010. That's when the zeros start. The zeros are in the same place on the original order and on remand because they didn't apply the test anew. They didn't change anything. They just said what we did the first time was good enough. It was fine. And so since there's no—the only thing the Commission did change is the count once, and nobody's challenging that. So that should just be the end of the matter. All right. I'm on page 588 of the Joint Appendix. I don't see—I see Table 3, which I thought was identical to Table 2, but it stops at FY 2011, and there isn't that last row of zeros. Is that just something that was left off? Yeah, Table 3 just reflects—I guess it just reflects that they only showed things that actually had values other than zero because the 2012 column in Table 2 of the brief is all zeros, and so that's just left off of Table 3. But I think the numbers are the same. All right. So in other words, Table 3, if it had gone forward, would be the same thing as Table 2 with respect to FY 2012. I believe that's correct, Your Honor. Yes. And lastly, just—although I think what I've just said disposes of the case, and the Court doesn't need to get into the analysis, just to be clear on what—when we say the new normal is the point where we expect you to adjust going forward, of course, what the Commission—that's because these are zeros. What the Commission means is at that point, we're back to—it's the new normal. We're back to inflation-based increases, and we're not counting any more mail volume. And so that's not describing—that's not so much describing a parameter of the test as it is the consequence of the test, which this Court was quite clear in understanding means this is the stopping point. This is the end. We're not counting any more mail pieces from this date forward. Let me ask you a question, which may or may not be relevant, depending on how one treats the prior opinion. The test—or Component 4 of the test, the Postal Service demonstrates an ability to adjust operations to lower volumes. It seems to me that there's something anomalous. Suppose the Post Office put on an incredibly persuasive PowerPoint, and this is what we can do. It will really adjust operations. It does that in the middle of 2009, and it also says you can put this into effect in the middle of 2010. So it's demonstrated the ability, but it hasn't been able to do it. It's going to take time to do it. The formulation there in Component 4 seems extraordinarily loose. Well, I guess a few responses— You said you should have complained about that. Right, but if you go back to—I mean, I guess two responses. One is that it's a four-factor test, and so this is one of the factors. So, of course, if mail volumes were still going down, if macroeconomic factors were still bad, if they were still unable to predict their mail volumes, which are the other three factors, then— And that's not a justification for being sloppy on Component 4. No, it's not, but I'm just saying if the question is, would the Commission have concluded that a good PowerPoint presentation means the new normal arrives, I just want to make clear that the Commission was not saying that because it had these other three factors. But looking at that factor— Let's assume the other three factors have been satisfied. Okay, so we're already assuming that the economy has recovered, mail volumes are starting to go up again, so that's significant. But even assuming that, if you look at page 98 of the Joint Appendix, which is 94 of the original order, and this is where the Commission originally applied the standard, and, of course, we would submit that since this is what they're challenging, they should have challenged it the last time, as your Honor indicated. But even talking about it now, the way the Commission applied the standard was to say that what they looked at, as earlier Colloquy indicated, was total factor productivity, and they looked at the extent to which the Postal Service had demonstrated an ability to adjust in the sense that they had actually begun to adjust and successfully made adjustments, not that they predicted that they would in the future be able to adjust. And so your Honor's suggestion that if the Postal Service said, oh, next year we'll be able to do something, the Commission would start counting that on the date that they came up with the plan, that isn't the way the Commission applied the standard the one time that it applied it, which, again, as we've said, was in the order that was at issue last time. I mean, in the data on TFP, I think it shows the first quarter continuing to decline, until maybe the second quarter, maybe even the third, that TFP starts to improve. I don't have those figures off the top of my head, but even if that's the case, I mean, again, at the risk of belaboring this, this is something that would have been challenged the last time. But even taking it up now, you know, the Commission was balancing four factors. It said, you know, sometime in fiscal 2010 is when this happened. And part of it relies heavily on this all or most. That's really quite scary, I think. Because I have to say to the TV that the natural reading of these is that all four have to be satisfied. Well, the all or most is a quote both from the Commission's order the first time and this Court's opinion. But it's kind of scary in terms of how regulatory commissions go about their work. Well, Your Honor, in practice, the thing to look at, you know, we have one data point, which is what the Commission actually, when the Commission actually applied the test. And it went through all four factors. It did its analysis. It looked at, you know, the macroeconomic factors and the fact that the postal volume started to increase again for a given category of mail turned out in practice to be the most significant factors, which is appropriate. And so if it were true that two of the factors were plainly satisfied and the other two weren't, and then the Postal Service said, you know, that that was inappropriate and they properly preserved that argument, then, you know, we could argue about whether the Commission's verbal formulation was inappropriate. But what happened here was that the Commission went through all four factors in the prior order, concluded, you know, picked the dates for the various categories of mail, which the Postal Service acknowledges were largely driven by the macroeconomic factors, which is what one would expect when we're talking about a recession as the exceptional event, and then also applied this fourth factor to suggest that as early as 2010 they were able to begin to adjust. And, you know, again, we don't think these questions are before the Court now, but if they were, we think the Court got it right the last time improperly in upholding the Commission's approach here. Unless there are further questions. I have one question on JA582. And the ability to adjust is one of the four prongs of the new normal, right? I'm sorry. I'm sorry. The ability to adjust is one of the four prongs to determine the new normal. Yes. All right. And that's fine. But then if you look at JA582, every time I see the word adjust I think of the fourth prong. And so you get to the end of that paragraph and the Commission says, the Commission's recognition of the limitations and obligations the law imposes on the Postal Service is not inconsistent with the Commission's fourth factor of the new normal analysis, which should be this ability to adjust, because the fourth factor simply expects that the Postal Service will, as it did, take steps to adjust to lower levels of mail volume once the new normal is reached. And that sounds like you do the ability to adjust both in determining the new normal and then once it's reached and the only thing you have left is the necessary proviso that you still use that ability to adjust. Well, Your Honor, I think that in order to – I'm going to try to tease out that sentence, but just to explain sort of how this works. So the ability to adjust is one of the factors, and I think what the sentence is saying is simply that the fourth prong of the new normal test is saying that once you have an ability to adjust, then we expect you to – and thus, and assuming the other factors are met as well, then we expect that you've reached the new normal, and then from then on we expect you to adjust going forward. And so the fact that there is a factor that's ability to adjust means that if you can adjust, then we expect that you will adjust. I think that's probably all the sentence is saying. But in terms of the way it comes in in two places, I think this goes back to a point I was trying to make earlier, which is that once the new normal is reached, then we know that we stop counting mail volumes as due to the recession and zeros going forward. And so then the expectation at that point is that anything further that happens, we expect the Postal Service to adjust to in its normal operations by – just as whenever there's an inflation-based cap, the Postal Service is just supposed to adjust to changes in circumstances. And so it's in the test because they didn't want to say that the new normal was reached without considering whether the Postal Service actually would be able to start adjusting. And then the consequence of concluding that the new normal is reached, which is all four factors, is that in fact, as a legal matter, then the Postal Service is obliged to adjust using the tools that are ordinarily available to it rather than those that are available when there's an exigent circumstance. And that's a lot to read into that one sentence, but I think that that explains why that term is sort of used in multiple ways, but they're all sort of related. All right. Am I wrong then that the Commission has said once the new normal is reached, Postal Service, you have also reached the ability – I mean, you have also adjusted? It's not so much that they have adjusted. Once the new normal is reached, and this Court discussed this point in the previous order, once the new normal is reached, the exigency has ended, and we will stop counting mail volume as due to the exigent circumstances, and therefore your authority to raise prices above the inflation cap has ended. And when that happens, then the Postal Service, because this is the baseline expectation that Congress had, the Postal Service is expected to adjust its operations to anything that happens, you know, outside of exigent circumstances just in the normal course within the inflation-based cap. So it has adjusted to the exigent circumstances at that point? Well, or it's compelled – I mean, it's – the question of whether it has adjusted is different, I think, to some degree from the question of whether it's entitled to raise its prices above inflation in order to adjust. And, of course, if the – just to give a simple example, and we're not accusing the Postal Service of this, but if the Postal Service had an ability to adjust but had failed to do so because of mismanagement or something, that wouldn't change the fact that the new normal had been reached and that they would be expected to do it going forward. So in that sense, I don't want to say they have adjusted. But what the Commission said is when there's an ability to begin to adjust and begin to adjust as the language used on the page I was discussing earlier, page 98, where they actually applied the standard, once that has happened, then that, together with the other factors, suggests that the new normal has been reached, and then we're just back to the inflation cap. I think that's all that's going on here. Okay. Is inflation for purposes of this price cap general price inflation, or is it the price inflation for inputs to the Postal Service's activities? It's been a while since I looked at this. I believe it's general price inflation. It's defined in this statute. I can flip to it if you want. Thank you, Your Honors. Thank you. Does Mr. Belt have any time? All right. Why don't you take a couple minutes? To answer your question, Judge Williams, yeah, it's general price inflation, CPI. I just want to make a couple of points, and I think my opponent has essentially, in a way, conceded that the test has changed. First of all, the disclaimer that the commission declines to revisit, as it said, doesn't insulate the case from appellate review. If the commission says it didn't change the test and then goes and changes the test, the fact they said they didn't isn't controlling. But I want to explain the two ways that I think that they did change the test. First, they now say, okay, when the new normal is reached, when the new level of, you know, the lower level of volumes, we just expect that you can adjust. Well, that's inconsistent with the test. The ability to adjust wasn't a conclusion that was reached once the other prongs were met. It was a prong. It was its own prong of the test. And I think the commission said it best. It summarized its own test on page 559 on remand when it said, the circumstance remained exigent until the Postal Service had an opportunity to adjust to the new normal in the mail economy. There are two different concepts there. There's the new normal, and then there's our ability to adjust to it. You can't jettison, or you can't assume that once the one's met, the other's met, too, because otherwise it wouldn't be a time period. I agree with you that the language to expect in the sentence you focused on is troubling and puzzling. But then the next, slightly further on in the line, comma, as it did, comma, indicates they were relying on what the Postal Service did, as they had in the previous order. Well, and that goes back to my question about the as it did refers to taking steps. And I would submit that if taking steps were the equivalent of adjusting, then the exigent provision doesn't mean anything. And this Court wouldn't have vacated the count-once rule, which was based on the idea that, well, you were taking steps. And the Court said that's not good enough, that ability to adjust means something more than that. The other way that I think that, if I may, the other way in which I think that my opponent sort of illustrated how the test has changed, they're now referring to this as a four-factor balancing test. And it is true that one of the iterations of the test as announced by the Court, I think on the commission, I think it was on JA90 maybe, was that it all or most. The other time, the other iteration said basically all. That was at JA6. And the proof is in the pudding. If you look at how the commission actually analyzed that test between pages JA90 to 98, it clearly was deciding that all four factors have to be met. Most of the factors, for example, were met for periodicals by 2010, and yet we got the benefit of 2011 for periodicals because one of the factors wasn't met until then. And the reason that's significant, I mean, it's significant because it's a change in the test. They're essentially saying we can jettison the ability to adjust if most, if the other three prongs are met. And I would also submit that even if not all prongs have to be met for the test to be satisfied, ability to adjust is not one that can be jettisoned because it measures something different. The other three measure the extent to which the Great Recession ceases forcing mail volume down and the ability to adjust prong measures something different. When could we deal with it? And for those reasons, the commission changed the test that it articulated to this Court and that this Court upheld. We ask that the case be remanded for the commission to at least explain why it's changing the test. Mr. Bell, it is September, so I can't resist asking you, has anything changed about the tremendous burden you have? It's something like $7 billion or whatever every September you have to lop off the top and give to the pension fund. I may have the number wrong. It's a huge number. At this point, nothing's changed in terms of our obligations, and nothing's changed in terms of the fact that we are still losing money. At this point, because we are out of borrowing authority, we have not been paying the fund. I mean, we still owe the money, but we don't have the cash to actually pay the pre-funding of the retiree health benefits. There was a brief time that, putting that aside, and it's hard to put it aside, it's a $5 billion a year obligation, but putting that aside, there was a brief moment when the exigent rate increase was in effect that we were essentially at break even as to everything else. But now with the expiration under the commission's order of the exigent surcharge, we're in the red even as to the cost that we can't control, which, again, belies the idea that we somehow gained this magical ability to adjust, let alone in 2010. Anyway, that's a long answer to a short question. And with that, thank you, Your Honors. Thank you.
judges: Henderson, Griffith, Williams